**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| FNY PARTNERS FUND LP and FNY MANAGED ACCOUNTS, LLC, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| | **CLASS ACTION** |
| Plaintiffs, | <u>JURY TRIAL DEMANDED</u> |
| vs. | |
| ALTA MESA RESOURCES, INC. f/k/a SILVER RUN ACQUISITION CORPORATION II, HARLAN H. CHAPPELLE, JAMES T. HACKETT, THOMAS J. WALKER, WILLIAM D. GUTERMUTH, JEFFREY H. TEPPER, DIANA J. WALTERS and RIVERSTONE HOLDINGS LLC, | |
| Defendants. | |

<u>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**</u>

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................ 2

II.     JURISDICTION AND VENUE .................................................................. 6

III.    PARTIES .................................................................................................... 6

IV.     SUMMARY OF THE ACTION ................................................................ 8

        A.      Blank Check Companies ................................................................. 8

        B.      Defendant Riverstone Forms Silver Run II ................................. 10

        C.      Silver Run II Agrees to Purchase Alta Mesa and Kingfisher to Retain its
                Investment ................................................................................... 12

        D.      Defendants Mislead Investors as a Pretext to Obtaining Shareholder
                Approval for the Acquisition ....................................................... 15

        E.      Defendants Release Poor Results While Continuing to Reassure Investors
                During the First Half of 2018....................................................... 19

        F.      The Truth Concerning Silver Run II's Business is Revealed Through a
                Series of Partial Corrective Disclosures ..................................... 21

V.      VIOLATIONS OF THE EXCHANGE ACT ............................................ 24

        A.      Defendants' Material Misstatements and Omissions in Violation of the
                Exchange Act ............................................................................... 24

                1.      Defendants' Materially False and Misleading Statements and Omissions of
                        Material Facts in 2017 ............................................................... 24

                2.      Defendants' Materially False and Misleading Statements and Omissions of
                        Material Facts in 2018 ............................................................... 26

        B.      Additional Allegations of Defendants' Scienter ................................. 32

        C.      Loss Causation ............................................................................. 34

        D.      Presumption of Reliance .............................................................. 37

VI.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND
        BESPEAKS CAUTION DOCTRINE ....................................................... 38

VII.    CLASS ACTION ALLEGATIONS .......................................................... 39

i

VIII.   FRAUD CLAIMS .................................................................................................. 40

COUNT I For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
       Promulgated Thereunder Against All Defendants ............................................ 40

COUNT II For Violations of Section 20(a) of the Exchange Act Against Riverstone and
       the Individual Defendants ............................................................................... 42

IX.     PROXY CLAIMS ................................................................................................. 42

COUNT III For Violations of Section 14(a) of the Exchange Act Against Silver Run II,
       Riverstone and the Individual Defendants ...................................................... 44

COUNT IV For Violations of Section 20(a) of the Exchange Act Against Riverstone and
       the Individual Defendants ............................................................................... 46

X.      PRAYER FOR RELIEF ...................................................................................... 47

XI.     JURY DEMAND ................................................................................................. 47

Plaintiffs, FNY Partners Fund LP and FNY Managed Accounts, LLC (collectively, "Plaintiffs"), bring this class action (the "Action") for violations of:

(i)   Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (the "Fraud Claims") on behalf of themselves and all other persons or entities, excluding Defendants, that purchased or otherwise acquired securities of Alta Mesa Resources, Inc., f/k/a Silver Run Acquisition Corporation II ("Silver Run II" or the "Company") during the period August 16, 2017 through February 25, 2019, inclusive (the "Class Period"), and were damaged thereby; and

(ii)  Sections 14(a) and 20(a) of the Exchange Act (the "Proxy Claims") on behalf of themselves and other Alta Mesa shareholders as of the January 22, 2018 record date that were entitled to vote on the proposed transaction (the "Acquisition") to acquire Alta Mesa Holdings, LP ("Alta Mesa") and Kingfisher Midstream LLC ("Kingfisher").

Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Silver Run II's filings with the U.S. Securities and Exchange Commission ("SEC"), including Silver Run II's Definitive Merger Proxy Statement issued to the Company's shareholders on Schedule 14A, dated January 19, 2018 (the "Proxy"), as well as press releases, investor presentations, earnings calls and analyst and media reports about the Company.

Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within Defendants' custody or control. Plaintiffs believe that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.    <u>INTRODUCTION</u>

1.    The Fraud and Proxy Claims alleged herein arise from Defendants' materially false and misleading statements and omissions of material facts in Silver Run II's Class Period earning calls, Form 10-K, Forms 10-Q and January 19, 2018 Proxy concerning the prospects of Alta Mesa and Kingfisher – the entities Silver Run II announced it was acquiring on August 16, 2017 (the first day of the Class Period).

2.    Specifically, Defendants made materially false and misleading statements and omissions of material facts in the run up to the Acquisition concerning, among other things, the estimated 2018 and 2019 earnings for Kingfisher and Alta Mesa.  In March 2018, *less than two months after shareholders voted for the Acquisition, Silver Run II adjusted the Kingfisher and Alta Mesa earnings estimates downward 46% and 8%*, causing Silver Run II's stock to lose 16.5% of its value in the ensuing four trading days.  Remarkably, Silver Run later conceded that the conditions that led to these adjustments began in 2017 – *before* the January 2018 Proxy was issued.

3.    Defendant Silver Run II and the Individual Defendants were highly motivated to make false and misleading statements and omissions leading up to the Acquisition.  As detailed below, Silver Run II was required to enter into a qualifying business combination transaction before March 2019 or it would be forced to repurchase its shares from shareholders at the original purchase price, and its sponsor, energy private equity giant Riverstone Holdings LLC ("Riverstone"), would lose its entire investment.

*        *        *

4.    Defendant Riverstone created Silver Run II in 2016 expressly for the purpose of merging with or acquiring another as-yet-unidentified energy business.  As a so-called "blank check" company, Silver Run II did not have any established business or operations.  Rather, its

shareholders would benefit from Riverstone's expertise in the energy sector in identifying undervalued companies for a merger or acquisition.

5.      Accordingly, pursuant to the offering materials for its March 2017 initial public offering (the "IPO"), Silver Run II was required to acquire a target business in the energy industry with an aggregate fair market value of at least 80% of the assets held in trust from the offering proceeds.  Silver Run II was obligated to redeem 100% of its outstanding public shares if it failed to complete such business combination within two years of the IPO.

6.      Motivated to effectuate a transaction before the two years expired, in August 2017 Silver Run II announced it had entered into an agreement, subject to shareholder approval, to acquire Alta Mesa and Kingfisher, two privately held companies.  Alta Mesa was an oil and gas exploration and production company (an "upstream company") operating in the STACK (Sooner Trend (oil field), Anadarko (Basin) Canadian and Kingfisher (counties)) play in Oklahoma. Kingfisher was a company that specialized in the gathering, processing and marketing of hydrocarbons from oil and gas producers (a "midstream company") in the same Oklahoma basin. The two companies had overlapping owners, and Kingfisher's primary client was Alta Mesa.

7.      Unfortunately for Silver Run II's shareholders, Alta Mesa and Kingfisher were not remotely as valuable as they were portrayed by Silver Run II beginning in August 2017 and continuing through the January 2018 Proxy issued to convince shareholders to vote in favor of the Acquisition.  Even after the shareholder vote in February 2018, Silver Run continued to issue false and misleading statements in an attempt to prop up Silver Run II's share price.

8.      The Class Period begins with the Company's August 16, 2017 announcement of the Acquisition.  From the Company's initial announcement through the February 2018 closing of the Acquisition, Defendants overstated the value of the assets being acquired in order to induce

3

shareholders to vote in favor of the transaction. Among other things, Defendants touted that Alta Mesa and Kingfisher were poised for substantial near-term growth, while failing to disclose operational setbacks, customer uncertainty and predictable well shutdowns as a result of planned projects commenced in 2017. Defendants also failed to disclose material weaknesses with the Company's internal controls over financial reporting.

9.     On March 29, 2018, less than two months after the close of the Acquisition, Silver Run II issued a press release announcing that the EBITDA and production estimates it had provided prior to the close of the Acquisition were materially overstated. CEO of the post-transaction Company, Defendant Harlan ("Hal") H. Chappelle ("Chappelle"), admitted during Silver Run II's fourth quarter earnings call that the Company *had begun suffering from "setbacks" beginning in "late 2017"* that were adversely impacting the Company. These defects – which Chappelle admitted were known prior to issuance of the Proxy and the Acquisition vote – included the fact that multiple "large third-party producers" had delayed drilling on acreage served by Kingfisher, which the Company subsequently said pushed back the timeline for growing its pipeline business by six months and for a possible public offering of the asset "perhaps" into 2019.

10.     On August 14, 2018, Silver Run II provided its second quarter 2018 financial results, disclosing more disappointing numbers – again admitting that it did not meet its recently published projections because of defects that began "*back in the fourth quarter of '17*." Rather than the positive growth portrayed to investors before closing the Acquisition, Silver Run II revealed that Alta Mesa's oil production had actually declined sequentially during the quarter, largely because the Company's wells had suffered from repeated "shut-ins" or restricted production caps, resulting in an average daily loss of thousands of barrels of oil equivalent

("BOE").    Chappelle conceded that the "shut-ins" resulted from work done in 2017 and the problems "linger[ed] into the first quarter of '18."

11.    While announcing these previously known, but undisclosed, defects in March and August 2018, Silver Run II repeatedly characterized the problems as merely temporary delays, and continued to advertise that the Company was poised for substantial growth.  While these attempts partially alleviated investor concerns, the truth about Silver Run II's defects continued to be revealed in late 2018 and early 2019.  On November 13, 2018, Silver Run II released its third quarter 2018 financial results.   Incredibly, the Company now projected 2018 EBITDA for Kingfisher to be only $36-38 million – a far cry from the $185 million it had estimated for investors just 10 months prior.  Silver Run II's pitch to investors in August 2017 and the Proxy both relied on Kingfisher's EBITDA growth as a key factor in the valuation and rationale for the Acquisition. The Company further announced that Michael A. McCabe ("McCabe"), the Company's Chief Financial Officer ("CFO"), was retiring.  Approximately one month later, in December 2018, Silver Run II also announced the sudden resignation of its CEO, Defendant Chappelle, and Michael E. Ellis, the Company's Vice President and Chief Operating Officer for the upstream (Alta Mesa) division.

12.    The extent of Silver Run II's defects was further revealed on February 25, 2019, when the Company announced it was unable to timely file its 2018 annual report because of a "material weakness" in its financial reporting.  Because of this material weakness, Silver Run II revealed that it was taking a ***$3.1 billion write down***.  Moreover, despite estimates in the January 2018 Proxy that the Company would increase its average active rig count to 11 rigs in 2019, Silver Run II announced that by the end of January 2019 the Company ***had reduced its active rig count to zero***.

5

13.     The value of Silver Run II's securities held by Plaintiffs and other members of the Class declined substantially as a result of these disclosures.  Indeed, from August 16, 2017 to February 26, 2019, the price of the Company's common stock fell by over ***95%***.

14.     Moreover, holders of Class A common stock on January 22, 2018 (the "Record Date"), that were eligible to vote on the Acquisition were fraudulently induced by the misleading Proxy to vote in favor of the Merger.  At the time of the vote, investors could have voted against the Acquisition and redeemed their shares for approximately $10 per share.  The Company's shares are now worth less than $0.50 per share.

## II.    <u>JURISDICTION AND VENUE</u>

15.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Silver Run II has its headquarters in this District, and many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material fact, occurred in this District.

17.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications and the facilities of a national securities exchange.

## III.    <u>PARTIES</u>

18.     Plaintiff FNY Partners Fund LP is a Delaware limited partnership that invests in equity securities.  As set forth in the certification attached hereto as Exhibit 1, FNY Partners Fund LP purchased shares of Silver Run II Class A common stock during the Class Period, and suffered

damages due to Defendants' violations of the federal securities laws alleged herein.  Plaintiff FNY

Partners Fund LP held shares on the January 22, 2018 Record Date, and was thus entitled to vote

on the Acquisition.

19.    Plaintiff FNY Managed Accounts, LLC is a Delaware limited liability company that

invests in equity securities.  As set forth in the certification attached hereto as Exhibit 2, FNY

Managed Accounts, LLC purchased shares of Silver Run II Class A common stock during the Class

Period, and suffered damages due to Defendants' violations of the federal securities laws alleged

herein.

20.    Defendant Alta Mesa Resources, Inc. ("Silver Run II" or the "Company") is an oil

and gas company with its principal place of business at 15021 Katy Freeway, Suite 400, Houston,

Texas 77094.  The Company is incorporated in Delaware and is focused on oil and gas exploration

and production in the Anadarko Basin of Oklahoma.  Its Class A common shares trade on the

NASDAQ under the symbol "AMR" and its public warrants trade under the symbol "AMRWW."

Prior to February 12, 2018, the Company's Class A stock traded on the NASDAQ under the symbol

"SRUN," its public warrants traded under the symbol "SRUNW," and its ownership units, which

contained both stock and fractional warrants, traded under the symbol "SRUNU."

21.    Defendant Harlan H. Chappelle was the CEO of the combined Silver Run II entity

following the Acquisition.  Defendant Chappelle had previously served as Alta Mesa's CEO since

2004.

22.    Defendant James T. Hackett was the CEO and a director of Silver Run II prior to

the Acquisition and became Executive Chairman of the Silver Run II Board of Directors (the

"Board") following the Acquisition.  Defendant Hackett is also the Chief Operating Officer

("COO") of Silver Run II's midstream Kingfisher business.  At the time of the Acquisition, Hackett

was a Partner at Riverstone and co-head of its Houston office. Prior to joining Riverstone in 2013, Hackett served as Chairman and CEO of Anadarko Petroleum Corporation.

23.     Defendant Thomas J. Walker served as the CFO of Silver Run II prior to the Acquisition. At the time, Walker was also the CFO and a Partner of Riverstone.

24.     Defendant William Gutermuth served as a member of the Board at the time of the Acquisition.

25.     Defendant Jeffrey H. Tepper served as a member of the Board at the time of the Acquisition.

26.     Defendant Diana J. Walters served as a member of the Board at the time of the Acquisition.

27.     The Defendants named in ¶¶21-26 are referred to herein as the "Individual Defendants."

28.     Defendant Riverstone Holdings, LLC is a private equity firm focused on the energy sector. It sponsored the IPO and the Acquisition through various related affiliates and investment vehicles.

## IV.    SUMMARY OF THE ACTION

### A.    Blank Check Companies

29.     A "blank check" company is a company that has no specific established business plan or purpose, or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company, entity or person. These companies typically involve speculative investments strategies.

30.     One type of "blank check" company is a "special purpose acquisition company," or "SPAC." An SPAC is a publicly-traded company created specifically to pool funds through an initial public offering for the purpose of completing an acquisition or other business combination

8

with an existing company.  Generally, SPACs are founded by public companies or private asset managers.  Since 2014, there has been a resurgent interest in SPAC IPOs, and over $10 billion in total funds were raised towards SPACs in 2017.

31.    In order to create a SPAC, founders must invest the initial capital to recruit an investment bank to structure capital raising terms, prepare and file IPO documentation, and pre-market the investment offering to interested investors.  A target company cannot be identified before the SPAC IPO is completed.  Once capital is raised through the IPO, at least 90% of the proceeds must be deposited into a trust account, and any interest is paid to the investors.  An appointed management team (typically the SPAC's founders) then has a specified period of time, typically between 18 and 24 months, in which to identify an appropriate target to complete the merger or acquisition.  NASDAQ rules dictate the initial business combination must be with one or more target businesses that together have a fair market value equal to 80% of the balance in the SPAC trust account.  Although the only purpose of an SPAC is to acquire a target company, SPACs generally have corporate governance structures similar to other operating companies.

32.    All common stockholders of the SPAC are granted voting rights to approve or reject the business combination proposed by the management team. Thus, when the management team identifies a target, a merger proxy statement must be distributed to all SPAC stockholders, which includes the target company's complete audited financials and the terms of the proposed business combination.  To this end, stockholders in "blank check" companies depend on management to honestly provide accurate information about any contemplated transactions.  In anticipation of the shareholder vote, each SPAC shareholder has three options, they can:  (i) approve the transaction by voting in favor of it; (ii) elect to sell their shares in the open market; or (iii) vote against the transaction and redeem their shares for a pro-rata share of the trust account.

33.     If a merger or acquisition is successfully made within the allocated time frame, shareholders and management of the SPAC can profit through their ownership of the common stock (and any related securities) in the newly acquired company.  However, if an acquisition is not completed within the time period specified at the organization of the SPAC, then the SPAC is automatically dissolved and the money held in trust is returned back to the original investors.  No salaries, finder's fees or other cash compensation are paid to the founders and/or management team if they fail to consummate a successful business combination.  Accordingly, the founders and management team of an SPAC are highly incentivized to get a deal approved within the operating deadline.

**B.    Defendant Riverstone Forms Silver Run II**

34.      Silver Run II was formed in 2016 as a "blank check" company for the purpose of effecting a business combination in the energy industry.  The Company was formed by Riverstone Global Energy and Power Fund VI, an energy-focused private investment fund managed by Defendant Riverstone.

35.     On or about March 24, 2017, Silver Run II completed its IPO, selling 103.5 million ownership units to investors for gross proceeds of $1.035 billion.  Each unit was priced at $10 and consisted of one share of Class A common stock and one-third of a warrant to purchase Class A shares.  Each whole warrant entitled the holder to purchase one share of Silver Run II Class A common stock at $11.50 per share.  The IPO was sponsored by Defendant Riverstone.

36.     Silver Run II's management and board were closely affiliated with Defendant Riverstone.  For example, at the time of the IPO, Defendant Hackett, Silver Run II's CEO and a member of the Board, was a Partner at Riverstone and co-head of its Houston office.  Moreover, the Silver Run II's CFO, Defendant Walker, was a Partner at Riverstone and served as its CFO.

10

Likewise, Stephen S. Coats, the Corporate Secretary of Silver Run II, was a Riverstone Partner and served as its General Counsel.

37.    At the time of its IPO, the offering materials stated that the Company planned to pursue an acquisition that would capitalize on Riverstone's expertise in the energy industry by leveraging its industry experience and insider knowledge to acquire "fundamentally sound" assets that were underpriced and offered attractive investment returns.

38.    The "acquisition criteria" for Silver Run II provided in its IPO offering materials included a business combination with companies that:

- can utilize the extensive networks and insights we have built in the energy industry;

- are at an inflection point, such as requiring additional management expertise, are able to innovate through new operational techniques, or where we believe we can drive improved financial performance;

- are fundamentally sound . . . [and] . . . are underperforming their potential; exhibit unrecognized value or other characteristics, desirable returns on capital, and a need for capital to achieve the company's growth strategy, that we believe have been misevaluated by the marketplace based on our analysis and due diligence review; and

- will offer an attractive risk-adjusted return for our stockholders. We will seek to acquire the target on terms and in a manner that leverages our management team's experience investing within the energy industry. Potential upside from growth in the target business and an improved capital structure will be weighed against any identified downside risks.

39.    Pursuant to the IPO prospectus, Silver Run II was required to enter into a transaction with a target business having an aggregate fair market value of at least 80% of the assets held in trust from the IPO proceeds, and to do so within two years of the March 2017 IPO.

40.    This requirement created significant pressure on Defendant Riverstone to quickly find, obtain approval for and close a transaction. In the event Silver Run II did not complete an

initial business combination within the required time period, the Company was obligated to redeem 100% of its outstanding public shares. Shareholders also had the right to redeem their shares at the time of the initial business combination if they did not want to retain a continuing interest in the business after the transaction.

### C.    Silver Run II Agrees to Purchase Alta Mesa and Kingfisher to Retain its Investment

41.    The Class Period begins on August 16, 2017, when Silver Run II announced that it had entered into a preliminary agreement, subject to shareholder approval, to merge with two closely related companies, Alta Mesa and Kingfisher. The full deal was initially valued at approximately $3.8 billion.

42.    Alta Mesa was an oil and gas exploration and production company focused on the development and acquisition of unconventional oil and natural gas reserves in the eastern portion of the Oklahoma Anadarko Basin referred to as the STACK (Sooner Trend (oil field), Anadarko (Basin) Canadian and Kingfisher (counties)). In addition to be an acronym for the location of the basin, the structures in the area are also multiple, "stacked" productive formations. The STACK is purportedly a prolific hydrocarbon system with high oil and liquids-rich natural gas content, multiple horizontal target horizons, extensive production history and historically high drilling success rates.

43.    Kingfisher was a midstream company primarily focused on providing crude oil gathering, gas gathering, and processing and marketing to producers of natural gas, natural gas liquids ("NGLs"), crude oil and condensate in the STACK play. Kingfisher and Alta Mesa were closely affiliated and had overlapping owners. Indeed, in 2016 nearly 97% of Kingfisher's revenues derived from production out of wells operated by Alta Mesa.

44.      In the Acquisition, Silver Run II, Riverstone and the owners of Kingfisher and Alta Mesa were supposed to contribute equity and funding to the combined Company, except for, as detailed in the Proxy, the owners of Kingfisher (who largely overlapped with Alta Mesa's owners), who had insisted on receiving a large cash payout from the Acquisition rather than taking additional equity in the surviving business.

45.      Following the Acquisition, the owners of Alta Mesa and Kingfisher would own 37% and 14% of the combined Company, respectively.  Riverstone would own 22% of the Company, and Silver Run II's shareholders would own 27%.   In addition, Alta Mesa's prior owners would be entitled to collectively nominate up to four directors to the Silver Run II Board, which would be expanded to eleven members after the Acquisition closed.

46.      If the Acquisition closed, the public shareholders of Silver Run II prior to the transaction would hold only 26.9% of the voting stock in Silver Run II and the ability to elect a minority of the Board.  However, despite their lack of control over the Company, Silver Run II's shareholders would be exposed to 61.1% of its economic risk.

47.      The follow chart illustrates Silver Run II's ownership structure following the proposed Acquisition:



48.    Alta Mesa's and Kingfisher's former executives were highly motivated to quickly close the Acquisition.  At the time of the Acquisition, Alta Mesa hoped to transition from a de-risk strategy to developing its wells.  This required liquidity, which Defendant Riverstone was offering to provide through the transaction with Silver Run II.  Similarly, Kingfisher required additional liquidity for several planned development projects.

49.    As noted, Riverstone's and Silver Run II's officers and directors were also incentivized to quickly agree to, obtain shareholder approval for, and close a transaction.  If Silver Run II failed to secure an initial business combination by March 29, 2019, according to the Proxy, "[Riverstone and our] officers and directors will lose their entire investment."  In such case, Silver

Run II would be wound up and Riverstone would be obligated to redeem 100% of the Company's public shares at a per share price payable in cash.

50.    According to the Proxy, negotiations regarding the Acquisition had been ongoing since at least March 2017 – shortly after the IPO – and involved the consideration of "multiple alternative target opportunities."  Given the extended duration of these negotiations, and the fact that Riverstone purportedly found all alternatives to be unsuitable for an initial business combination, it is unlikely that Riverstone would have been able to complete another business combination within the requisite time period if Silver Run II shareholders did not vote to approve the Acquisition.

51.    Accordingly, because the Acquisition was likely Defendants' last chance to retain the investment, Defendants started to "sell" the Acquisition to investors.  For example, during a presentation to investors announcing the Acquisition on August 17, 2017, Defendants touted that Kingfisher had a "leading position in the STACK play" and was "uniquely positioned to capitalize on the increasing development in the STACK."   Defendants projected that Kingfisher's 2019 EBITDA was $318 million.

52.    Likewise, during Alta Mesa's third quarter 2017 earnings call on November 14, 2017, Defendant Chappelle advertised Alta Mesa's new wells and its "strong production growth." At no time in 2017 did Defendant Chappelle disclose the operational "setbacks" that started in "late 2017" by his own admission.

D.    **Defendants Mislead Investors as a Pretext to Obtaining Shareholder Approval for the Acquisition**

53.    On January 19, 2018, Silver Run II issued a Definitive Merger Proxy Statement to its shareholders on Schedule 14A in connection with the efforts by Silver Run II, the Board and Riverstone to secure shareholder support for the Acquisition.  The Proxy recommended that Silver

Run II's shareholders vote in favor of the Acquisition, while continuing to omit and misrepresent material information concerning core issues at Alta Mesa and Kingfisher that diminished their future expected cash flows.

54.    The Proxy stated that Alta Mesa and Kingfisher satisfied the acquisition criteria outlined in the IPO offering materials.  The Proxy further stated that Riverstone and Silver Run II believed "Alta Mesa and Kingfisher were of superior quality" and offered significant value and high quality assets to shareholders of Silver Run II with attractive risk-adjusted returns.

55.    Similarly, the Proxy stated that the Silver Run II Board's recommendation that shareholders vote "FOR" the business combination was based on "careful consideration" and extensive due diligence.  The Proxy represented that the Board had considered "a wide variety of factors in connection with its evaluation of the business combination" and had determined that the following factors, among others, supported its recommendation that shareholders vote in favor of the Acquisition:

- *Alta Mesa's Highly Contiguous Acreage in the STACK*.  Alta Mesa has approximately 130,000 highly contiguous acres in the up-dip oil window of the STACK, one of the most active and prolific stacked pay basins in North America. In addition, Alta Mesa's deep inventory includes over 4,000 primary gross locations and over 12,000 possible locations from down spacing, as well as additional zone penetration.

- *World Class Asset with Attractive Geology*.  Alta Mesa's oil-weighted resource features high margins, low break-even commodity prices, and single-well rates of return in excess of 85%.  Silver Run and Alta Mesa's management believe there are further opportunities for improving efficiencies through technology and optimizing well design.

- *Top-Tier Operator with Substantial STACK Expertise and Highly Consistent Well Results*.  Alta Mesa's management has over 30 years' of experience operating in the STACK, and Silver Run believes that this experience provides Alta Mesa with a competitive advantage.  As of September 30, 2017, Alta Mesa has drilled more than 220 horizontal STACK wells, and currently has a multi-rig program, averaging six rigs in 2017.  Of the 220 wells drilled, over 183 were on production, and of that number, about 116 had sufficient production history to give Alta Mesa's

management confidence that Alta Mesa's type well EUR is greater than 650 MBOE.

- *Highly Strategic and Synergistic Midstream Platform*. Kingfisher's midstream assets overlay Alta Mesa's contiguous acreage in the STACK, and afford Alta Mesa with a purpose-built system to handle larger volumes in an efficient processing system. Kingfisher's system allows Alta Mesa to access Midwest and Gulf Coast markets through the Panhandle Eastern Pipeline, as well as western interstate markets through OGT. In addition to serving Alta Mesa, Kingfisher has grown its customer base since its inception to include other active producers that have provided acreage dedications. Silver Run believes that Kingfisher offers a unique opportunity to own a rapidly expanding midstream business underpinned by 10 to 15 year acreage dedications early in their term and that Kingfisher also has the potential for a subsequent midstream initial public offering.

- *Strong Liquidity Profile*. After giving effect to the business combination, Silver Run expects to have sufficient liquidity and financial flexibility to fund Alta Mesa's and Kingfisher's development projects and pursue opportunistic acquisitions.

- *Terms of the Contribution Agreement*. Silver Run's board of directors reviewed the financial and other terms of the Contribution Agreements and determined that they were the product of arm's-length negotiations among the parties.

56. The Proxy especially focused on the potential opportunities relating to Kingfisher. For example, the Proxy noted that Kingfisher had developed a strong, local midstream system underpinned by long-term acreage dedication contracts from multiple active producers, as well as firm takeaway contracts on key pipelines. The Proxy further indicated that Kingfisher was well-positioned to benefit from increasing upstream development activity in an active and prolific basin with upside potential from further expansion projects. In addition, the Proxy stated that there was significant upside in the completion of the Kingfisher system and the potential for a subsequent midstream initial public offering.

57. Notably, with respect to Alta Mesa, the Proxy stated it "was operating six horizontal drilling rigs in the STACK with plans to continue to operate that number of rigs through the end of 2017." The Proxy also represented that Alta Mesa expected to increase the average number of rigs in operation to 10 in 2018, and to 11 in 2019.

17

58.     The Proxy likewise stated that Alta Mesa and Kingfisher were poised for accelerating growth immediately following the Acquisition.  For example, the Proxy indicated that Alta Mesa had achieved an estimated 2017 average net daily production of 20.8 thousand barrels of oil equivalent per day ("MBOE/d") and was expected to increase its 2018 average net daily production to 38.5 MBOE/d and its 2019 average net daily production to 68.9 MBOE/d.

59.     The Proxy also included positive EBITDA projections.  It stated that Alta Mesa had achieved 2017 adjusted EBITDAX of $155 million, and was expected to increase its 2018 adjusted EBITDAX to $358 million and its 2019 adjusted EBITDAX to $701 million.  In addition, the Proxy stated that Kingfisher was estimated to have achieved $42 million in 2017 EBITDA, and was expected to increase its 2018 EBITDA to $185 million and its 2019 EBITDA to $318 million. Notably, these projections matched the estimates provided during the August 2017 investor presentation announcing the proposed Acquisition.

60.     The Proxy went to great lengths to justify these projections.  For example, the Proxy stated that these "financial projections were prepared on a reasonable basis" and "reflected the best currently available estimates and judgments of Alta Mesa and Kingfisher, as applicable."  Further, the Proxy represented that these financial figures "presented, to the best of their knowledge and belief, the expected course of action and the expected future financial performance of Alta Mesa and Kingfisher, respectively."   The Proxy also represented to investors that the estimates and projections contained therein were based on observable trends and capabilities and economically justified assumptions regarding the expected cash flows of Alta Mesa and Kingfisher.

61.     In the Proxy, the Board recommended that Silver Run II stockholders "vote 'FOR' the Business Combination Proposal," based, in part, on the above projections.  Accordingly, the

projections provided in the Proxy, were used to induce Silver Run II shareholders to vote in favor of the Acquisition and to forgo redeeming their shares.

62.    As a result of Defendants' rosy – but misleading – picture of the Acquisition, Silver Run II stockholders voted in favor of the Acquisition at a special shareholders meeting on February 6, 2018.  The false and misleading Proxy induced stockholder action that resulted in substantial harm to Plaintiffs and Silver Run II's other shareholders.  Specifically, the material misrepresentations and omissions in the Proxy were an essential link in the approval of the Acquisition, and the Class A common stock held by Plaintiffs and other Class members declined substantially in value due to approval of the Acquisition, causing economic loss and damages.

63.    After the stockholder vote, on February 9, 2018, Silver Run II issued a press release announcing that the Acquisition had closed.  Following the closing, the Company changed its name from "Silver Run Acquisition Corporation II" to "Alta Mesa Resources, Inc." and continued listing its Class A Common stock and Public Warrants on NASDAQ under the new symbols "AMR" and "AMRWW," respectively.

### E.    Defendants Release Poor Results While Continuing to Reassure Investors During the First Half of 2018

64.    On March 29, 2018, Silver Run II issued an earnings release announcing its 2017 financial results, filed its Form 10-K and held an earnings call.  The earnings release disclosed that the EBITDA and production estimates provided in the Proxy had been dramatically reduced. Specifically, the release revealed that Kingfisher was expected to post only $95 to $110 million in EBITDA at the midpoint of 2018, 46% below the 2018 EBITDA estimate of $185 million provided in the Proxy.  In addition, the release revealed that Alta Mesa was expected to post an average net daily production of only 33 to 38 MBOE/d at the midpoint for the year, 8% below the production figures provided in the Proxy.

65. During a conference call to discuss the results, Defendant Chappelle, the CEO of the combined business (and former CEO of Alta Mesa), stated that multiple "large third-party producers" had delayed drilling on acreage served by Kingfisher, which pushed Silver Run II's timeline for growing its pipeline business back by six months and a possible public offering of Kingfisher "perhaps" into 2019.  Even though they had not been disclosed in the Proxy (filed in January 2018), ***Defendant Chappelle admitted that these "setbacks" began in "late 2017."***

66. Following the March 29, 2018 announcement, Alta Mesa's stock price fell from $8.38 per common share at close on March 28, 2018 to $8.00 per common share at close on March 29, 2018.  The stock price further fell to $7.06 per common share at close on April 3, 2018 as investors further digested the news the following week.

67. While the March 29, 2018 announcements partially revealed the truth about the misleading projections issued by Defendants during 2017, Defendants continued to conceal the reality of the Company's struggling operations, business prospects and controls.  Indeed, during the fourth quarter earnings call Defendant Chapelle told investors that Kingfisher's reduced guidance was simply due to "delayed drilling" and that the Company expected it would only be a "six months' shift" from the previous estimates.  Chapelle further stated that despite the "setbacks," Kingfisher's "vision for growth remain[s] strong."  He also stated that the Company continued to plan an eventual spin-off of Kingfisher into an independent public company.

68. In response to a question about the reduced projections, Defendant Chappelle stated that with regard to Alta Mesa's upstream business, they are about a "two-month shift in the calendar" from projects on a production basis.  He further stated Silver Run II expected to be on track "early first quarter next year, and possibly as early as this year."  Chappelle reiterated that the midstream Kingfisher business was only a "six-month shift in the calendar" from previous

estimates.  The analyst who asked the question, Irene Haas from Imperial Capital, responded that Chappelle's response was "really reassuring."

69.     Defendants continued to hide the ball during the Company's first quarter earnings call on May 14, 2018.  Instead of revealing Silver Run II's drastically diminishing business prospects, Defendant Chapelle stated that the Company was "reaffirming our FY '18 guidance." With respect to Kingfisher, Chapelle stated that "recent operating and strategic highlights by Kingfisher Midstream continue to support the long-term vision[.]"  He also confirmed there is "no change from before" regarding the Company's plan to be self funding by the end of 2019.

### F.    The Truth Concerning Silver Run II's Business is Revealed Through a Series of Partial Corrective Disclosures

70.     On August 14, 2018, Silver Run II provided its second quarter 2018 financials, again posting disappointing results and slashing its outlook due to numerous operational setbacks. The Company revealed that Alta Mesa's oil production – instead of continuing to grow as advertised in 2017 and early 2018 – had actually *declined* sequentially during the quarter and that it now expected to achieve average daily net production of only 30.0 MBOE/d at the midpoint for 2018, 22% below the estimates provided in the Proxy.  Far from the reliable and consistent well production represented to investors in 2017 and early 2018, Silver Run II revealed that throughout 2018 Alta Mesa's wells had suffered from repeated shut-ins, causing an average loss of thousands of BOE every day.  Moreover, despite its prior assurances the problems were merely temporary delays, Silver Run II revealed the adverse drilling  trends had been worsening.

71.     On an earnings call to discuss the results, Defendant Chappelle revealed that the shut-ins resulted from work done or planned "back in the fourth quarter of '17," which had "linger[ed] into the first quarter of '18."  Despite arising from work that predated the Acquisition, these adverse effects were not disclosed to investors prior to the Acquisition vote.

72.    The problems with the Company's Kingfisher midstream business were also partially revealed during the August 14, 2018 announcement.  Despite the Company's $185 million 2018 EBITDA forecast for Kingfisher in the Proxy, Kingfisher only had $6.1 million in EBITDA during the second quarter.

73.    Following the announcement of Silver Run II's second quarter results, the Company's stock price fell over 21% from $6.08 per share at close on August 13, 2018 to $4.77 per share at close on August 14, 2018.

74.    While the truth was partially revealed during the second quarter earnings announcements, Defendants continued to represent that the problems were temporary and that a turnaround was imminent.  For instance, the Company's investor presentation stressed that its "production trajectory remains strong."  Defendant Chappelle explained on the Company's earning call that the dip in production was merely due to "short term logistics" and not "from a change in prospectivity of a low cost high return acreage position and the resource underlying it."

75.    Silver Run II also attempted to express optimism by announcing a share buyback program.  As Defendant Chappelle explained on the earnings call, the Board instituted the buyback because its belief the Company's opportunity had "strengthened" and the Company was continuing to "grow production."

76.    These efforts to downplay the concerns at least partially succeeded.  For example, during the earnings call, analyst Derrick Whitfield from Stifel stated that the Company did a "nice job" of "conveying" the setbacks and "alleviat[ing] . . . concerns."

77.    The truth continued to be revealed when Silver Run II released its third quarter 2018 financial results on November 13, 2018.  Silver Run II's abysmal results were highlighted by the even further reduced EBITDA guidance for Kingfisher.  A far cry from the $185 million

2018 EBITDA guidance just 10 months ago, the Company now projected Kingfisher's 2018 EBITDA to be only $36-$38 million.  In other words, ***Kingfisher's projected 2018 EBITDA was almost 80% less than the projections in the Proxy issued just 10 months earlier***.

78.    On the third quarter earnings call, Defendant Hackett blamed the Company's poor performance on "significant headwinds" and other "technical challenges."  As Chappelle has conceded, the Company had been aware of these "setbacks" since "late 2017" – well before the issuance of the Proxy and the misleading statements throughout the first half of 2018.

79.    In connection with the release of the third quarter results, the Company also announced its CFO, Defendant McCabe, was retiring.  Approximately one month later, in December 2018, Silver Run II also announced the sudden resignation of its CEO, Defendant Chappelle, and its Vice President and COO of Upstream, Michael Ellis.

80.    Following the announcement of the Company's third quarter results, the Company's share price fell nearly 15% from $2.82 per common share at close on November 13, 2018 to $2.40 per common share at close on November 14, 2018.  The Company's share price fell an additional 5% to close at $2.29 per share on November 15, 2018.

81.    On February 25, 2019, the Company announced that it "had an ineffective internal control over financial reporting due to an identified material weakness in both the design of its controls and the execution of its control procedures."  The Company further disclosed it "expect[ed] to record material, non-cash asset impairment charges" of approximately $3.1 billion (approximately $2.0 billion for the upstream segment and $1.1 billion for the midstream segment).  Moreover, Silver Run II disclosed that it had entered 2019 with six rigs actively working, but reduced the active rig count to zero by the end of January 2019.

82.     Following this disclosure, Alta Mesa's common stock fell over 63% from $0.91 per common share at close on February 25, 2019 to $0.34 per common share at close on February 26, 2019.

83.     Subsequent to, and due to, the closing of the Acquisition, the price of Silver Run II Class A common stock declined precipitously as the truth about Alta Mesa and Kingfisher and the Proxy's false and misleading statements were revealed over time.   By March 2019, the price of Silver Run II Class A common stock was trading below $0.40 per share, 96% below the price shareholders would have received if they had redeemed their shares instead of approving the Acquisition approximately one year earlier.

## V.     VIOLATIONS OF THE EXCHANGE ACT

### A.     Defendants' Material Misstatements and Omissions in Violation of the Exchange Act

84.     Defendants made materially false and misleading statements and/or omissions of material facts during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.   As further explained below, Defendants' representations were materially false and misleading and omitted material facts when made.

#### 1.     Defendants' Materially False and Misleading Statements and Omissions of Material Facts in 2017

##### a)   August 2017 Investor Presentation and Related Investor Call

85.     On August 16, 2017, Silver Run II announced the proposed Acquisition of Alta Mesa and Kingfisher.   In connection with the announcement, Silver Run II released an investor presentation and held an investor call to discuss the proposed transaction.

86.     During its presentation, the Company stated that Alta Mesa was poised for accelerating growth immediately following the Acquisition, stating that it had "industry-leading

24

growth potential" and a "2-year expected EBITDA CAGR of 128%." The Company believed this growth was likely because it had a "world class asset" and that it was a "top-tier operator." The Company projected that would increase its average active rigs from 6 in 2017 to 10 in 2018 and 11 in 2019. Similarly, the Company projected its Average Net Daily Production (BOE/d) to increase 82% year-over-year from 20,292 barrels in 2017 to 66,897 barrels in 2019. Financially, the Company stated that Alta Mesa had achieved 2017 adjusted EBITDAX of $155 million and was expected to increase its 2018 adjusted EBITDAX to $358 million and its 2019 adjusted EBITDAX to $701 million.

87.     The statements in ¶ 86 were materially false and misleading when made. Contrary to Defendants' statements, they knew, or were reckless in not knowing, Silver Run II's wells had started to experience repeated "shut-ins" or restricted production caps in 2017, resulting in an average daily loss of thousands of BOE, which significantly slowed the Company's cash flows and earnings.

88.     Silver Run II's presentation also stated that Kingfisher was "rapidly expanding" and "positioned to capture volume growth from the STACK." In addition, the Company represented that Kingfisher was "well positioned to serve other operators" and take advantage of the "[e]xpansion opportunities in [the] rapidly growing basin." Silver Run II also touted that there was an opportunity to monetize Kingfisher and fund upstream capital needs through spinning off Kingfisher as a master limited partnership (MLP) IPO. The presentation also stated that Kingfisher was estimated to have achieved $42 million in 2017 EBITDA and was expected to increase its 2018 EBITDA to $185 million and its 2019 EBITDA to $318 million.

89.     The statements in ¶ 88 were materially false and misleading and omitted material facts when made. Among other things, Defendants knew that beginning in 2017 multiple "large

third-party producers" had delayed drilling on acreage served by Kingfisher, which would delay the Company's timeline for growing its pipeline business and as a result the Company's cash flow would be adversely impacted.

### 2. Defendants' Materially False and Misleading Statements and Omissions of Material Facts in 2018

#### a) Proxy Statement

90.     On January 19, 2018, Defendants issued a Definitive Merger Proxy Statement to its shareholders on Schedule 14A.  The Proxy contained numerous statements and projections that it claimed were "financial projections . . . prepared on a reasonable basis" and "reflected the best currently available estimates and judgments of Alta Mesa and Kingfisher, as applicable."  Further, the Proxy represented that its financial figures "presented, to the best of their knowledge and belief, the expected course of action and the expected future financial performance of Alta Mesa and Kingfisher, respectively."

91.     In addition, the Proxy stated that Kingfisher had developed a strong, local midstream system underpinned by long-term acreage dedication contracts from multiple active producers, as well as firm takeaway contracts on key pipelines.  Accordingly, the Proxy represented that Kingfisher was well-positioned to benefit from increasing upstream development activity in an active and prolific basin with upside potential from further expansion projects.

92.     The Proxy further stated that there was significant upside in the completion of the Kingfisher system and the potential for a subsequent midstream initial public offering.  The Proxy also stated that Kingfisher was estimated to have $42 million in 2017 EBITDA, and was expected to increase its 2018 EBITDA to $185 million and its 2019 EBITDA to $318 million.  Notably, these projections matched the estimates provided during the August 2017 investor presentation announcing the proposed transaction.

26

93.    The statements in ¶¶ 90-92 were materially false and misleading and omitted material facts when made.  Among other things, Silver Run II knew that beginning in 2017 multiple "large third-party producers" had delayed drilling on acreage served by Kingfisher, which would delay the Company's timeline for growing its pipeline business and as a result the Company's cash flow would be adversely impacted.

94.    With respect to Alta Mesa, the Proxy stated it "was operating six horizontal drilling rigs in the STACK with plans to continue to operate that number of rigs through the end of 2017." The Proxy stated that Alta Mesa expected to increase the average number of rigs in operation to 10 in 2018 and to 11 in 2019.  The Proxy also stated that Alta Mesa was poised for accelerating growth immediately following the Acquisition, including that estimated 2017 average net daily production of 20.8 MBOE/d and was expected to increase its 2018 average net daily production to 38.5 MBOE/d and its 2019 average net daily production to 68.9 MBOE/d.  Similarly, the Proxy stated that Alta Mesa had achieved 2017 adjusted EBITDAX of $155 million and was expected to increase its 2018 adjusted EBITDAX to $358 million and its 2019 adjusted EBITDAX to $701 million.

95.    The statements in ¶ 94 were materially false and misleading and omitted material facts when made.  Among other things, Defendants knew that beginning in 2017 its wells had suffered from setbacks, including repeated "shut-ins" or restricted production caps, resulting in an average daily loss of thousands of BOE, which would significantly impact its growth and earnings.

### b)    2017 Form 10-K and Related Earnings Call

96.    On March 28, 2018, Silver Run II filed its Form 10-K with the SEC for the year ended December 31, 2017 (the "2017 Form 10-K"), which was signed by Defendants Hackett, Gutermuth, Tepper and Walters, among others.  In the 2017 Form 10-K, Silver Run II represented

that its business "involves the use of the latest available horizontal drilling, completion and production technology, which involve risks and uncertainties in their application." Silver Run II further represented that its business "depend[s] on successful exploration, exploitation, development and acquisition to maintain reserves and revenue in the future."

97.    The statements in ¶ 96 were materially false and misleading and omitted material facts when made. Among other things, Defendants knew that beginning in 2017 its wells had suffered from setbacks, including repeated "shut-ins" or restricted production caps, resulting in an average daily loss of thousands of BOE.

98.    With respect to its Kingfisher midstream business, Silver Run II represented in its 2017 Form 10-K that "*If* third-party pipelines or other midstream facilities interconnected to our gathering, processing, storage or transportation systems become partially or fully unavailable, or if the volumes we gather, process, store or transport do not meet the quality requirements of the pipelines or facilities to which we connect, our gross profit and cash flow could be adversely affected."

99.    The statements in ¶ 98 were materially false and misleading and omitted material facts when made. Among other things, Defendants knew that beginning in 2017 multiple "large third-party producers" had delayed drilling on acreage served by Kingfisher, which would delay Company's timeline for growing its pipeline business and, as a result, the Company's cash flow would be adversely impacted.

100.    In the 2017 Form 10-K, the Company also discussed its disclosure controls and internal controls in Item 4 Controls and Procedures. The section was materially false and misleading and omitted material facts, as Silver Run II did not disclose that it had ineffective

28

internal control over financial reporting, which, as announced on February 25, 2019, would cause the Company to record material, non-cash asset impairment charges totaling $3.1 billion.

### c)    First Quarter Form 10-Q and Related Earnings Call

101.    On May 21, 2018, Silver Run II filed with the SEC its Form 10-Q for the quarter ending March 31, 2018 (the "2018 First Quarter Form 10-Q"), incorporating by reference each of the "Risk Factors" in its 2017 Form 10-K. This included the Company's assertion that its business "involves the use of the latest available horizontal drilling, completion and production technology, which involve risks and uncertainties in their application" and that its business "depend[s] on successful exploration, exploitation, development and acquisition to maintain reserves and revenue in the future."

102.    The statements in ¶ 101 were materially false and misleading and omitted material facts when made. Among other things, Defendants knew that beginning in 2017 its wells had suffered from setbacks, including repeated "shut-ins" or restricted production caps, resulting in an average daily loss of thousands of BOE.

103.    With respect to its Kingfisher midstream business, Silver Run II incorporated the Risk Factors from its 2017 Form 10-K, including that "*If* third-party pipelines or other midstream facilities interconnected to our gathering, processing, storage or transportation systems become partially or fully unavailable, or if the volumes we gather, process, store or transport do not meet the quality requirements of the pipelines or facilities to which we connect, our gross profit and cash flow could be adversely affected."

104.    The statements in ¶ 103 were materially false and misleading and omitted material facts when made. Among other things, Defendants knew that beginning in 2017 multiple "large third-party producers" had delayed drilling on acreage served by Kingfisher, which would delay

the Company's timeline for growing its pipeline business and, as a result, the Company's cash flow would be adversely impacted.

105.    The 2018 First Quarter Form 10-Q also discussed the Company's disclosure controls and internal controls in Item 4 Controls and Procedures.  The section was materially false and misleading and omitted material facts, as Silver Run II did not disclose that it had ineffective internal control over financial reporting, which, as announced on February 25, 2019, would cause the Company to record material, non-cash asset impairment charges totaling $3.1 billion.

### d)    Second Quarter Form 10-Q and Related Earnings Call

106.    On August 15, 2018, Silver Run II filed with the SEC its Form 10-Q for the quarter ended June 31, 2018 (the "2018 Second Quarter Form 10-Q"), incorporating by reference each of the "Risk Factors" in its 2017 Form 10-K, including that its business "involves the use of the latest available horizontal drilling, completion and production technology, which involve risks and uncertainties in their application" and that its business "depend[s] on successful exploration, exploitation, development and acquisition to maintain reserves and revenue in the future."

107.    The statements in ¶ 106 were materially false and misleading and omitted material facts when made.  Among other things, Defendants knew that beginning in 2017 its wells had suffered from setbacks, including repeated "shut-ins" or restricted production caps, resulting in an average daily loss of thousands of BOE.

108.    With respect to its Kingfisher midstream business, Silver Run II incorporated the "Risk Factors" section from its 2017 Form 10-K.  This included the Company's assertion that "*If* third-party pipelines or other midstream facilities interconnected to our gathering, processing, storage or transportation systems become partially or fully unavailable, or if the volumes we

gather, process, store or transport do not meet the quality requirements of the pipelines or facilities to which we connect, our gross profit and cash flow could be adversely affected."

109.    The statements in ¶ 109 were materially false and misleading and omitted material facts when made.  Among other things, Defendants knew that beginning in 2017 multiple "large third-party producers" had delayed drilling on acreage served by Kingfisher, which would delay the Company's timeline for growing its pipeline business and, as a result, the Company's cash flow would be adversely impacted.

110.    The Company also discussed its disclosure controls and internal controls in Item 4 Controls and Procedures in the 2018 Second Quarter Form 10-Q.  The section was materially false and misleading and omitted material facts, as Silver Run II did not disclose that it had an ineffective internal control over financial reporting, which, as announced on February 25, 2019, would cause the Company to record material, non-cash asset impairment charges totaling $3.1 billion.

### e)    Third Quarter Form 10-Q and Related Earnings Call

111.     On November 14, 2018, Silver Run II filed its Form 10-Q with the SEC for the quarter ending September 31, 2018 (the "2018 Third Quarter Form 10-Q"), incorporating by reference each of the "Risk Factors" in its 2017 Form 10-K, including that its business "involves the use of the latest available horizontal drilling, completion and production technology, which involve risks and uncertainties in their application" and that its business "depend[s] on successful exploration, exploitation, develop."

112.    The statements in ¶ 111 were materially false and misleading and omitted material facts when made.  Among other things, Defendants knew that beginning in 2017 its wells had suffered from setbacks, including repeated "shut-ins" or restricted production caps, resulting in an average daily loss of thousands of BOE.

31

113.    With respect to its Kingfisher midstream business, Silver Run II incorporated the "Risk Factors" from its 2017 Form 10-K, including that "*If* third-party pipelines or other midstream facilities interconnected to our gathering, processing, storage or transportation systems become partially or fully unavailable, or if the volumes we gather, process, store or transport do not meet the quality requirements of the pipelines or facilities to which we connect, our gross profit and cash flow could be adversely affected."

114.    The statements in ¶ 113 were materially false and misleading and omitted material facts when made.  Among other things, Defendants knew that beginning in 2017 multiple "large third-party producers" had delayed drilling on acreage served by Kingfisher, which would delay the Company's timeline for growing its pipeline business and, as a result, the Company's cash flow would be adversely impacted.

115.    The Company also discussed its disclosure controls and internal controls in Item 4. Controls and Procedures.  The section was materially false and misleading and omitted material facts, as Silver Run II did not disclose that it had an ineffective internal control over financial reporting, which, as announced on February 25, 2019, would cause the Company to record material, non-cash asset impairment charges totaling $3.1 billion.

## B.    Additional Allegations of Defendants' Scienter

116.    As alleged herein, numerous facts, in addition to those discussed above, raise a strong inference that Defendants knew or were reckless in disregarding the true facts concerning Silver Run II's operations, business prospects and internal controls over financial reporting. Because scienter is not an element of Plaintiffs' Proxy Claims, the allegations set forth in this section pertain only to Plaintiffs' Fraud Claims.

117.    The Company was motivated to mislead investors to close the transaction because of its desire to retain its initial investment.  As a blank check company, if Silver Run II did not

close a transaction valued at 80% or more of the value of the funds it held in trust within two years, the Company would be required to return funds to its investors. Moreover, if the Company did not complete a suitable transaction, Defendants would also lose the fees it paid in connection with the IPO and during the search for a suitable acquisition.

118.    As stated in the Proxy, the alternative transaction Silver Run II evaluated did not meet the acquisition criteria or had otherwise fallen through. As a result, the Alta Mesa/Kingfisher transaction was Silver Run II's last chance at retaining the $1.035 billion Silver Run II had raised through its March 2017 IPO. In other words, Silver Run II's executives had a choice – induce investors to vote for the Acquisition and attain lucrative positions with the post-transaction Company, or return over $1 billion to investors and lose the fees it had paid in connection with the IPO and search for an acquisition.

119.    Additionally, Defendant Chappelle has admitted that the Company knew many of its statements were false. During the Company's first quarter earnings call on March 29, 2018, Chappelle admitted that the "setbacks" impacting the Company began in "late 2017." Defendant Chappelle further admitted during the Company's second quarter earnings call in August 2018, that the "shut-ins" negatively impacting the Company resulted from work done or planned "back in the fourth quarter of '17," which had "linger[ed] into the first quarter of '18."

120.    Moreover, the stream of executive departures, including certain Individual Defendants, in the wake of the fallout from the fraud further supports an inference of scienter. For example, in November 2018, just months before Silver Run II disclosed that it was unable to timely file its 2018 annual report and that it was taking a $3.1 billion write down, Silver Run II announced that its CFO, Defendant McCabe, was retiring. Defendant Chappelle and VP and COO of

Upstream Michael Ellis similarly departed the Company suddenly in December 2018 – even more proximate to Silver Run II's revelations in February of 2019.

  **C.**   **Loss Causation**

121.   Because loss causation is not an element of Plaintiffs' Proxy Claim, the allegations set forth in this section pertain only to Plaintiffs' Fraud Claims. In connection with Plaintiffs' Fraud Claims, Defendants' misrepresentations and omissions of material fact alleged above in Section V.A. artificially inflated the price of Silver Run II's securities during the Class Period.

122.   The artificial inflation created by Defendants' alleged misrepresentations and omissions was removed from the prices of Silver Run II common stock and warrants in direct response to information revealed in the disclosures alleged in this Section, through which facts that partially corrected Defendants' prior misrepresentations and omissions of material fact were revealed and/or the risks concealed by such misrepresented and omitted material facts partially materialized.

123.   On March 29, 2018, Silver Run II issued a release announcing its 2017 financial results, filed its Form 10-K and held an earnings call. The earnings release disclosed that the EBITDA and production estimates provided in the Proxy had been dramatically reduced. The release revealed that Kingfisher was expected to post only $95 to $110 million in EBITDA at the midpoint of 2018, 46% below the 2018 EBITDA estimate of $185 million provided in the Proxy. In addition, the release revealed that Alta Mesa was expected to post an average net daily production of only 33 to 38 MBOE/d at the midpoint for the year, 8% below the production figures provided in the Proxy.

124.   Following these revelations, the price of Silver Run II common stock fell from $8.38 per common share at close on March 28, 2018 to $8.00 per common share at close on March

29, 2018.  The stock price further fell to $7.06 per common share at close on April 3, 2018 as investors digested the news the following week.

125.    As set forth above in ¶¶ 67-69, Defendants claimed the problems were temporary and continued to make positive statements about Silver Run II's expected growth.  Then, Silver Run II provided its second quarter 2018 financials on August 14, 2018, again posting disappointing results and slashing its outlook in the midst of numerous operational setbacks.  The Company revealed that Alta Mesa's oil production had ***declined*** sequentially during the quarter and that it now expected to achieve average daily net production of only 30.0 MBOE/d at the midpoint for 2018, 22% below the estimates provided in the Proxy.  Silver Run II further revealed that its Kingfisher midstream business had only had $6.1 million EBITDA in during the second quarter – significantly short of the pace required to meet the $185 million 2018 EBITDA forecast for Kingfisher in the Proxy.

126.    Following the announcement of Silver Run II's second quarter results, the Company's stock price fell over 21% from $6.08 per share at close on August 13, 2018 to $4.77 per share at close on August 14, 2018.

127.    On November 13, 2018, Silver Run II released its third quarter results, further reducing its EBITDA guidance for Kingfisher to be only $36-$38 million.  The Company also announced that its CFO Michael McCabe was retiring.

128.    Following the announcement of the Company's third quarter results, the Company's share price fell nearly 15% from $2.82 per common share at close on November 13, 2018 to $2.40 per common share at close on November 14, 2018.

129.    On February 25, 2019, the Company announced it could not timely file its annual report because it "had an ineffective internal control over financial reporting due to an identified

material weakness in both the design of its controls and the execution of its control procedures"

and that it "expect[ed] to record material, non-cash asset impairment charges" of approximately

$3.1 billion.  The Company further disclosed that its active rig count at the end of January 2019

was zero.

130.    Following this disclosure, Silver Run II's common stock fell over 63% from $0.91

per common share at close on February 25, 2019 to $0.34 per common share at close on February

26, 2019.

131.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused

the damages suffered by Plaintiffs and other Class members.  Had Defendants disclosed complete,

accurate and truthful information concerning these matters during the Class Period, Plaintiffs and

other Class members would not have purchased or otherwise acquired Silver Run II's securities,

or would not have purchased or otherwise acquired these securities at the artificially inflated prices

that they paid.  It was also entirely foreseeable to Defendants that misrepresenting and concealing

these material facts from the public would artificially inflate the price of Silver Run II securities

and that the ultimate disclosure of this information, and/or the materialization of the risks

concealed by Defendants' material misstatements and omissions, would cause the price of Silver

Run II securities to decline.

132.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and other Class members

directly resulted from Defendants' materially false and misleading statements and omissions of

material fact, which artificially inflated the price of the Company's securities when the truth was

revealed and/or the risks previously concealed by Defendants' material misstatements and

omissions materialized.  As a result of the previously misrepresented and concealed material

information and risks that were disclosed on March 29, 2018, August 14, 2018, November 5, 2018

and February 25, 2019, and the corresponding substantial decline in the price of Silver Run II securities as the market absorbed this information, Plaintiffs and other Class members have suffered economic loss.

      **D.**    **Presumption of Reliance**

133.    Because reliance is not an element of Plaintiffs' Proxy Claim, the allegations set forth in this section pertain only to Plaintiffs' Fraud Claims. At all relevant times, the market for Silver Run II's securities was efficient for the following reasons, among others:

> (a) Silver Run II's securities met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

> (b) As a regulated issuer, Silver Run II filed periodic reports with the SEC;

> (c) Silver Run II regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

> (d) Silver Run II was followed by numerous securities analysts employed by major brokerage firms, including Goldman Sachs, Guggenheim Securities and HS Energy Advisors, and who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

134.    As a result of the foregoing, the market for Silver Run II's securities promptly digested current information regarding Silver Run II from all publicly available sources and reflected such information in the price of Silver Run II's securities. All purchasers of Silver Run II securities during the Class Period suffered similar injury through their purchase of Silver Run II securities at artificially inflated prices, and a presumption of reliance applies.

135.    A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S.

128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## VI.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

136.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  None of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Silver Run II's business prospects and internal controls.

137.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Silver Run II's operations, prospects and controls, among others.  Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Silver Run II were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

138.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Silver Run II who knew that the statement was false when made.

## VII.    CLASS ACTION ALLEGATIONS

139.    Plaintiffs brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf individuals or entities who purchased or otherwise acquired securities of Silver Run II between August 16, 2017 and February 25, 2019, inclusive, and were damaged thereby, excluding Defendants and their affiliates.

140.    The Class is so numerous that joinder of all members is impracticable.    For example, at the time of the Proxy dated January 12, 2018, there were approximately 103.5 million public shares of Silver Run II Class A stock issued and outstanding, likely held by thousands of persons.

141.    There are questions of law and fact that are common to the Class, including:

(a) whether Defendants misrepresented material facts;

(b) whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(c)   whether the prices of Silver Run II's securities were artificially inflated;

(d) whether Defendants violated §14(a) of the Exchange Act by misrepresenting or omitting material information in the Proxy;

(e) whether Riverstone and the Individual Defendants are liable as "controlling persons" under §20(a) of the Exchange Act; and

(f) whether plaintiff and the other members of the Class were injured as a result of Defendants' misconduct.

142.    Plaintiffs' claims are typical of the claims of the other members of the Class, and plaintiff is not subject to any atypical claims or defenses.

143.    Plaintiffs are committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiffs have the same interests as the other members of the Class.  Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

144.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VIII.    <u>FRAUD CLAIMS</u>

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and
### <u>Rule 10b-5 Promulgated Thereunder Against All Defendants</u>

145.    Plaintiffs repeat and reallege each and every allegation contained above (other than disclaimers of fraud claims) as if fully set forth herein.

146.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Silver Run II securities at artificially inflated prices.

147.    Defendants:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Silver Run II's securities in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

148.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the Company's financial well-being, operation and prospects.

149.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

150.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Silver Run II and the Individual Defendants engaged in this misconduct to conceal Silver Run II's true condition from the investing public and to support the artificially inflated prices of the Company's securities.

151.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Silver Run II's securities.  Plaintiffs and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Silver Run II's securities had been artificially inflated by Defendants' fraudulent course of conduct.

152.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered economic loss and damages in connection with their respective purchases of the Company's securities during the Class Period as the prior artificial inflation in the price of Silver Run II's securities was removed over time.

153.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II
### For Violations of Section 20(a) of the
### Exchange Act Against Riverstone and the Individual Defendants

154.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above (other than disclaimers of fraud claims) as if fully set forth herein.

155.    As alleged above, Defendants each violated Section 10(b) and Rule 10b-5 thereunder by their acts and omissions as alleged in this Complaint.

156.    Riverstone and the Individual Defendants acted as controlling persons of Silver Run II within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control the materially false and misleading public statements about Silver Run II during the Class Period, Riverstone and the Individual Defendants had the power and ability to control the actions of Silver Run II and its employees.  By reason of such conduct, Riverstone and the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## IX.    PROXY CLAIMS

157.    Plaintiffs' Proxy Claims do not sound in fraud and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme or intentional conduct as part of their Proxy Claims. Any allegations of fraud, fraudulent conduct, or motive are specifically disclaimed from the following allegations for the purposes of Plaintiffs' claims under the Proxy Claim, which do not have scienter, fraudulent intent or motive as required elements.  To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud Plaintiffs or members of the Class.

42

158.    As alleged below, Silver Run II and the other Defendants made a series of materially untrue statements and omissions of material facts in Silver Run II's Proxy. Each of the Defendants participated in the preparation, review and dissemination of the materially misleading Proxy complained of herein. The Individual Defendants abdicated their duty to file and distribute to Plaintiff and the Class a Proxy that was not misleading.

159.    Defendants' untrue statements of material fact included, among other things, that:

- Kingfisher had developed a strong, local midstream system underpinned by long-term acreage dedication contracts from multiple active producers, as well as firm takeaway contracts on key pipelines and that Kingfisher was well-positioned to benefit from increasing upstream development activity in an active and prolific basin with upside potential from further expansion projects.

- There was significant upside in the completion of the Kingfisher system and the potential for a subsequent midstream initial public offering.

- Alta Mesa "was operating six horizontal drilling rigs in the STACK with plans to continue to operate that number of rigs through the end of 2017." The proxy also stated that Alta Mesa planned to increase the average number of rigs in operation to 10 in 2018, and to 11 in 2019.

- Alta Mesa had achieved an estimated 2017 average net daily production of 20.8 MBOE/d and was expected to increase its 2018 average net daily production to 38.5 MBOE/d and its 2019 average net daily production to 68.9 MBOE/d.

- Alta Mesa had achieved 2017 adjusted EBITDAX of $155 million and was expected to increase its 2018 adjusted EBITDAX to $358 million and its 2019 adjusted EBITDAX to $701 million.

- Kingfisher was estimated to have achieved $42 million in 2017 EBITDA and was expected to increase its 2018 EBITDA to $185 million and its 2019 EBITDA to $318 million. Notably, these projections matched the estimates provided during the August 2017 investor presentation announcing the proposed transaction.

- The financial projections in the Proxy were prepared on a "reasonable basis" and "reflected the best currently available estimates and judgments of Alta Mesa and Kingfisher, as applicable." That these financial figures "presented, to the best of their knowledge and belief, the expected course of

43

action and the expected future financial performance of Alta Mesa and Kingfisher, respectively."

160.    Defendants' representations were untrue and omitted material facts when made, including that:

- Silver Run II knew that beginning in 2017 its wells had suffered from setbacks, including repeated "shut-ins" or restricted production caps, resulting in an average daily loss of thousands of BOE, which would significantly impact its growth and earnings.

- Silver Run II knew that beginning in 2017 multiple "large third-party producers" had delayed drilling on acreage served by Kingfisher, which would delay Company's timeline for growing its pipeline business and as a result the Company's cash flow would be adversely impacted.

- Silver Run II knew the Company suffered from material weaknesses over its financial reporting, which would lead to a significant write down of over $3 billion.

161.    The extent of Silver Run II's problems were partially revealed on March 29, 2018, August 14, 2018, November 13, 2018 and February 25, 2019.  In total, the disclosures caused the price of Silver Run II's securities to fall by over 95% from the date of the vote on the Acquisition.

## COUNT III
### For Violations of Section 14(a) of the Exchange Act
### Against Silver Run II, Riverstone and the Individual Defendants

162.    Plaintiffs repeat and reallege the allegations in ¶¶ 1-83, 139-144 and 157-161  as if set forth fully herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

163.    The Proxy Statement and Supplement, documents attached thereto and/or incorporated by reference therein, and other solicitations described above contained misstatements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading.

164.    Defendants named in this count, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Proxy Statement and Supplement.

165.    Silver Run II is an issuer of the Proxy Statement and Supplement.

166.    Silver Run II permitted the use of its name in the Proxy Statement and Supplement by allowing the Proxy to represent, among other things, that the proposed Acquisition was expected to generate positive returns and was in the best interest of shareholders.

167.    Defendant Hackett signed the cover letters for the Proxy Statement and Supplement, and otherwise permitted the use of his name in the Proxy.

168.    The Proxy Statement and Supplement was issued "By Order of the Board of Directors" and "as part of the solicitation of proxies by [the Company's] board of directors." Moreover, the Board Defendants permitted the use of their names by, among other things, allowing the Proxy Statement and Supplement to represent that they recommended the Acquisition.

169.    By means of the Proxy Statement and Supplement and documents attached thereto or incorporated by reference therein, Defendants sought to secure Plaintiffs' and other Class members' approval of the Acquisition, and solicited proxies from Plaintiffs and other members of the Class.

170.    Each Defendant named in this Count acted negligently in making false and misleading statements of material facts, omitting material facts required to be stated in order to make the statements contained therein not misleading, and failing to update their statements, which were false at the time they were issued and were also rendered false and misleading by additional material information which arose after the dissemination of these statements and before the vote on the Acquisition.

171.    The solicitations described herein were essential links in the accomplishment of the Acquisition.  As a result of these solicitations, the Silver Run II shareholders approved the merger.

172.    Plaintiffs and Class members eligible to vote on the merger were denied the opportunity to make an informed decision in voting on the merger and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

173.    This claim is brought within the applicable statute of limitations.

174.    By reason of the foregoing, Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

**COUNT IV**
**For Violations of Section 20(a) of the Exchange Act**
**Against Riverstone and the Individual Defendants**

175.    Plaintiffs repeat and reallege the allegations in ¶¶1-83, 139-144, 157-174  as if set forth fully herein.

176.    As alleged above, Silver Run II violated Section 14(a) of the Exchange Act by its acts and omissions as alleged in this Complaint.

177.    Riverstone and the Individual Defendants acted as controlling persons of Silver Run II within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  By virtue of their ownership interest, high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control the Proxy, Riverstone and the Individual Defendants had the power and ability to control the actions of Silver Run II and its employees.  By reason of such conduct, Riverstone and the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

178.    Plaintiffs and Class members eligible to vote on the merger were denied the opportunity to make an informed decision in voting on the merger and were damaged as a direct

and proximate result of the untrue statements and omissions in the Proxy and other solicitations described herein.

179.    This claim is brought within the applicable statute of limitations.

180.    By reason of the foregoing, Riverstone and the Individual Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding such equitable/injunctive or other further relief (including, but not limited to, rescission) as the Court may deem just and proper.

## XI.    JURY DEMAND

181.    Plaintiffs hereby demand a trial by jury.

47

DATED: March 19, 2019                    Respectfully submitted,


                                         */s/ Andrew J. Entwistle*
                                         Andrew J. Entwistle
                                         (Texas Bar No. 24038131)
                                         **ENTWISTLE & CAPPUCCI LLP**
                                         500 W. 2nd Street, Suite 1900-16
                                         Austin, TX 78701
                                         Telephone:  (512) 710-5960

                                             -and-

                                         Robert N. Cappucci (*pro hac vice application forthcoming*)
                                         Joshua K. Porter (*pro hac vice application forthcoming*)
                                         Andrew M. Sher (*pro hac vice application forthcoming*)
                                         **ENTWISTLE & CAPPUCCI LLP**
                                         299 Park Avenue, 20th Floor
                                         New York, New York 10017
                                         Telephone:  (212) 894-7200

                                         *Counsel for Plaintiffs FNY Partners Fund LP and*
                                         *FNY Managed Accounts, LLC*